UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION


STEPHEN BRENT MCNEELY,

                    Plaintiff,

v.                                          Case No. 3:16-cv-377-J-34MCR

SECRETARY, FLORIDA DEPARTMENT
OF CORRECTIONS, et al.,

                    Defendants.

_____

**<u>ORDER</u>**

**I. Status**

Plaintiff Stephen Brent McNeely, an inmate of the Florida penal system, initiated this action on March 25, 2016, pursuant to the mailbox rule, by filing a Civil Rights Complaint (Doc. 1) pursuant to 42 U.S.C. § 1983. He filed an Amended Complaint (Doc. 5) on July 7, 2016, and a Second Amended Complaint (SAC; Doc. 80) on March 2, 2018. In the SAC, McNeely names the following Defendants: (1) Secretary of the Florida Department of Corrections (FDOC); (2) Shawn Swain; (3) Michael Harris; (4) Cleon Johnson; (5) Mosley; (6) Blitch; (7) Korey; (8) Williams; (9) Whatley; (10) Assistant Warden Godwin; and (11) Warden Reddish. He asserts that the Defendants violated his federal constitutional rights when they used excessive force against him on March 30, 2012, and were

deliberately indifferent to his mental health needs. He seeks compensatory, punitive, and nominal damages as well as injunctive and declaratory relief.

This matter is before the Court on Defendants' Motion for Summary Judgment (Motion; Doc. 82) with exhibits (Def. Ex.; Docs. 82-1 through 82-19). The Court advised McNeely of the provisions of Federal Rule of Civil Procedure 56, notified him that the granting of a motion to dismiss or a motion for summary judgment would represent a final adjudication of this case which may foreclose subsequent litigation on the matter, and gave him an opportunity to respond to the Motion. See Summary Judgment Notice (Doc. 83); Order (Doc. 7). McNeely responded with exhibits (P. Ex.; Docs. 103-1 through 103-33). See Response to the Defendants' Motion for Summary Judgment (Response; Doc. 103). Defendants' Motion is ripe for review.

## II. Plaintiff's Allegations

In his verified SAC,[1] McNeely asserts: (1) the FDOC Secretary violated his Eighth Amendment right when she failed to train Swain,

---

[1] See Stallworth v. Tyson, 578 F. App'x 948, 950 (11th Cir. 2014) (citations omitted) ("The factual assertions that [Plaintiff] made in his amended complaint should have been given the same weight as an affidavit, because [Plaintiff] verified his complaint with an unsworn written declaration, made under penalty of perjury, and his complaint meets Rule 56's requirements for affidavits and sworn declarations.").

Harris, Blitch, and the extraction team[2] on how to address McNeely's mental illness; (2) Swain and Harris violated his Eighth Amendment right when they failed to supervise the extraction team on March 30, 2012; (3) Swain and Harris violated his Eighth Amendment right when they were deliberately indifferent to McNeely's mental health needs on March 30th; (4) the extraction team members violated his Eighth Amendment right when they used excessive force against McNeely on March 30th; (5) the extraction team, Blitch, Swain, and Harris violated his Eighth Amendment right when they failed to intervene and/or protect McNeely on March 30th; (6) Swain violated his Eighth and Fourteenth Amendment rights when he directed Blitch to improperly videotape the March 30th incident; (7) Blitch violated his Eighth and Fourteenth Amendment rights when he failed to properly videotape the March 30th incident; (8) Reddish and Godwin violated his Eighth Amendment right when they failed to supervise and train Swain, Harris, Blitch, and the extraction team on March 30th; and (9) Reddish and Godwin violated his First Amendment right when they threatened McNeely about filing grievances relating to the March 30th use of force incident. See SAC at 6-8.

---

[2] The extraction team members during the March 30, 2012 incident were Cleon Johnson, Joshua Mosley, Eric Williams, Brandon Korey, and Wesley Whatley. See Def. Exs. G-K. For brevity, the Court may refer to these Defendants as the extraction team.

As to the underlying facts of his claims, McNeely asserts that he declared a psychological emergency on March 30, 2012, while housed in the transitional care unit at Union Correctional Institution (UCI), and notified Swain and Harris that he was suicidal. See id. at 8. According to McNeely, Swain and Harris told him they did not respect psychological emergencies, and that, instead of mental health treatment, the extraction team would beat him. See id. McNeely states that Swain directed the extraction team to enter his cell and give him "some black eyes." Id. He describes what transpired when the extraction team entered his cell.

> I attempted suicide by cutting my arm (artery) open with a small piece of an aluminum can and tried to get out into the hallway so I would be on camera in order to "try" and prevent them from "getting away" with the abuse (excessive force) I knew was coming.
>
> I was unable to get out into the hallway. I pushed off of the shield and rolled on top of the mattress and placed my hands behind my back and stopped resisting.
>
> While I lay on top of the mattress, not resisting, with my hands behind my back, officers Johnson, Mosley, Williams, Korey, and Whatley began punching me all over my body, including my head and face. They were gouging my eyes.

Id. at 8-9 (enumeration and emphasis omitted). McNeely declares that Blitch failed to properly record the incident, and that Blitch told him weeks later that Swain directed him not to properly record the incident. See id. at 9. He states that none of the Defendants tried to stop the beating. See id. He asserts that he was "rushed"

to Gainesville Trauma Center after the beating, got eight stitches on his arm, and suffered "deep bruising all over his face," a left eye infection, and severe headaches. Id. at 11.

According to McNeely, Godwin talked to him on April 2, 2012, and commented that his black eyes "looked nice," he was "lucky" he still had teeth, there was a "new chief in town," and disobedience would not be tolerated even if they had to blacken a few eyes and break some bones. Id. at 9. McNeely avers that Godwin told him that there was no video footage, and if he filed any grievances related to the March 30th incident, they would disappear, and he would get "a real" use of force with some missing teeth. Id. at 10. According to McNeely, he spoke with Reddish on April 5th about the threats, and Reddish advised him not to file a grievance. See id.

### III. Motion to Dismiss Standard

In ruling on a motion to dismiss, the Court must accept the factual allegations set forth in the complaint as true. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002); see also Lotierzo v. Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002). In addition, all reasonable inferences should be drawn in favor of the plaintiff. See Randall v. Scott, 610 F.3d 701, 705 (11th Cir. 2010). Nonetheless, the plaintiff must still meet some minimal pleading requirements. Jackson v. Bellsouth Telecomm., 372 F.3d 1250, 1262-63 (11th Cir. 2004) (citations omitted). Indeed, while

"[s]pecific facts are not necessary[,]" the complaint should "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" <u>Erickson v. Pardus</u>, 551 U.S. 89, 93 (2007) (per curiam) (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)). Further, the plaintiff must allege "enough facts to state a claim that is plausible on its face." <u>Twombly</u>, 550 U.S. at 570. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678 (citing <u>Twombly</u>, 550 U.S. at 556).

A "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" <u>Twombly</u>, 550 U.S. at 555 (internal quotations omitted); <u>see</u> <u>also</u> <u>Jackson</u>, 372 F.3d at 1262 (explaining that "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal") (internal citation and quotations omitted). Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions[,]" which simply "are not entitled to [an] assumption of truth." <u>See Iqbal</u>, 556 U.S. at 678, 680. Thus, in ruling on a motion to dismiss, the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face[.]'" <u>Id.</u> at 678 (quoting <u>Twombly</u>, 550 U.S. at 570). And, while "[p]ro se pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed," <u>Tannenbaum v. United States</u>, 148 F.3d 1262, 1263 (11th Cir. 1998), "'this leniency does not give the court a license to serve as <u>de</u> <u>facto</u> counsel for a party or to rewrite an otherwise deficient pleading in order to sustain an action.'" <u>Alford v. Consol. Gov't of Columbus, Ga.</u>, 438 F. App'x 837, 839 (11th Cir. 2011)[3] (quoting <u>GJR Invs., Inc. v. Cty. of Escambia, Fla.</u>, 132 F.3d 1359, 1369 (11th Cir. 1998) (internal citation omitted), <u>overruled in part on other grounds as recognized in</u> <u>Randall</u>, 610 F.3d at 706).

## IV. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure (Rules(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including

---

[3] "Although an unpublished opinion is not binding . . . , it is persuasive authority." <u>United States v. Futrell</u>, 209 F.3d 1286, 1289 (11th Cir. 2000) (per curiam); <u>see</u> <u>generally</u> Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).[4] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial.

---

[4] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable.

See <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." <u>Haves v. City of Miami</u>, 52 F.3d 918, 921 (11th Cir. 1995) (citing <u>Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro</u>, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## V. Summary of the Arguments

In the Motion, Defendants request dismissal of McNeely's claims against them because McNeely failed to exhaust his administrative remedies, as required by the Prison Litigation Reform Act (PLRA), before filing the instant 42 U.S.C. § 1983 lawsuit. <u>See</u> Motion at 13-15. They also assert that there are no genuine issues of material fact, and therefore, the Court should grant summary judgment in their favor as to McNeely's (1) Eighth

Amendment claims against the extraction team, Swain, Harris, Reddish, and Godwin, see id. at 15-19; (2) failure to train claims against Jones, Reddish, and Godwin, see id. at 19-20; and (3) First Amendment retaliation claims against Reddish and Godwin, see id. at 20. They also maintain that (1) McNeely's failure to train and supervisory claims against Godwin and Reddish are not timely filed, see id. at 12-13; (2) Defendants are entitled to qualified immunity, see id. at 20-21; (3) the Eleventh Amendment bars McNeely's claims for monetary damages against the Defendants in their official capacities, see id. at 21; and (4) McNeely fails to assert that he suffered any physical injuries as a result of Defendants' acts and/or omissions, see id. at 21-23.

In response to Defendants' Motion, McNeely asserts that (1) his failure to train and supervisory claims against Godwin and Reddish are timely filed, see Response at 14-16; (2) he failed to exhaust because the FDOC's administrative remedies were unavailable to him due to Reddish and Godwin's threats, see id. at 16-23; (3) the extraction team violated his Eighth Amendment right when they used excessive force against him, see id. at 23-29; (4) the extraction team, Blitch, Harris, and Swain failed to intervene to stop the assault, see id. at 30; (5) Reddish, Godwin, Swain, and Harris failed to supervise their subordinates, see id. at 30-31; (6) Reddish and Godwin violated his First Amendment right when they threatened to retaliate against him if he filed any grievances

10

related to the use of force incident, <u>see</u> <u>id.</u> at 31-32; and (7) Defendants are not entitled to qualified immunity, <u>see</u> <u>id.</u> at 33-34.

## VI. Exhaustion of Administrative Remedies

### 1. Exhaustion under the PLRA

Exhaustion of available administrative remedies is required before a 42 U.S.C. § 1983 action with respect to prison conditions may be initiated by a prisoner. <u>See</u> 42 U.S.C. § 1997e(a). Nevertheless, a prisoner such as McNeely is not required to plead exhaustion. <u>See</u> <u>Jones v. Bock</u>, 549 U.S. 199, 216 (2007). Instead, the United States Supreme Court has recognized "failure to exhaust is an affirmative defense under the PLRA[.]" <u>Id.</u> Notably, exhaustion of available administrative remedies is "a precondition to an adjudication on the merits" and is mandatory under the PLRA. <u>Bryant v. Rich</u>, 530 F.3d 1368, 1374 (11th Cir. 2008); <u>Jones</u>, 549 U.S. at 211; <u>Woodford v. Ngo</u>, 548 U.S. 81, 85 (2006) ("Exhaustion is no longer left to the discretion of the district court, but is mandatory.") (citation omitted). Not only is there an exhaustion requirement, "the PLRA exhaustion requirement requires proper exhaustion." <u>Woodford</u>, 548 U.S. at 93.

> Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for these parties to do what they would otherwise prefer not to do, namely, to give the agency a fair and full opportunity to adjudicate their claims. Administrative law does this by requiring proper exhaustion of

11

administrative remedies, which "means using
all steps that the agency holds out, and doing
so _properly_ (so that the agency addresses the
issues on the merits)." _Pozo_,[5] 286 F.3d, at
1024. . . .

_Woodford_, 548 U.S. at 90. And, "[p]roper exhaustion demands

compliance with an agency's deadlines and other critical procedural

rules . . . ." _Id._ As such, the United States Supreme Court has

emphasized:

Courts may not engraft an unwritten
"special circumstances" exception onto the
PLRA's exhaustion requirement. The only limit
to § 1997e(a)'s mandate is the one baked into
its text: An inmate need exhaust only such
administrative remedies as are "available."

_Ross v. Blake_, 136 S.Ct. 1850, 1862 (2016).

Although proper exhaustion is generally required, a remedy

must be "available" before a prisoner is required to exhaust it.

_Turner v. Burnside_, 541 F.3d 1077, 1084 (11th Cir. 2008); _Goebert_

_v. Lee Cty._, 510 F.3d 1312, 1323 (11th Cir. 2007). An

administrative remedy may be unavailable when prison officials

interfere with a prisoner's pursuit of relief. _See_ _Ross_, 136 S.Ct.

at 1860. The Eleventh Circuit has explained:

[A]t least some threats disrupt the operation
and frustrate the purposes of the
administrative remedies process enough that
the PLRA's exhaustion requirement does not
allow them. The construction of "availability"
that we adopt is beneficial because it reduces
any incentive that prison officials otherwise
might have to use threats to prevent inmates

---

[5] _Pozo v. McCaughtry_, 286 F.3d 1022 (7th Cir. 2002).

> from exhausting their administrative remedies,
> and it thereby safeguards the benefits of the
> administrative review process for everyone.
>
> We conclude that a prison official's
> serious threats of substantial retaliation
> against an inmate for lodging or pursuing in
> good faith a grievance make the administrative
> remedy "unavailable," and thus lift the
> exhaustion requirement as to the affected
> parts of the process if both of these
> conditions are met: (1) the threat actually
> did deter the plaintiff inmate from lodging a
> grievance or pursuing a particular part of the
> process; and (2) the threat is one that would
> deter a reasonable inmate of ordinary firmness
> and fortitude from lodging a grievance or
> pursuing the part of the grievance process
> that the inmate failed to exhaust. See
> Hemphill,[6] 380 F.3d at 688 ("The test for
> deciding whether the ordinary grievance
> procedures were available must be an objective
> one: that is, would 'a similarly situated
> individual of ordinary firmness' have deemed
> them available." (citation omitted)); cf.
> Smith v. Mosley, 532 F.3d 1270, 1277 (11th
> Cir. 2008) (noting that an inmate claiming a
> First Amendment violation based on retaliation
> for a complaint about prison conditions must
> show that the discipline "would likely deter a
> prisoner of ordinary firmness from
> complaining" (quotation marks and alteration
> omitted)).

Turner, 541 F.3d at 1085. However, threats of retaliation will not

excuse a failure to exhaust where the prisoner has been removed

from the threats such that they no longer pose an impediment to

completion of administrative procedures. See, e.g., Bryant, 530

F.3d at 1379 ("Bryant was later transferred to another prison where

the threat of violence was removed. There, he could have filed an

---

6 Hemphill v. New York, 380 F.3d 680, 688 (2d Cir. 2004).

out-of-time grievance and then shown good cause for its untimeliness. Because he did not, Bryant failed to exhaust an administrative remedy that was available to him."); <u>Poole v. Rich</u>, 312 F. App'x 165, 167–68 (11th Cir. 2008) ("Even if we assume that Poole was threatened and that these threats rendered grievance procedures at Rogers [State Prison] unavailable to Poole, Poole's complaint is still due to be dismissed because he has failed to allege that grievance procedures were unavailable to him once he was no longer incarcerated at Rogers and was removed from the threats of violence made by the officials at that prison.").

The determination of whether an inmate exhausted his available administrative remedies prior to filing a cause of action in federal court is a matter of abatement and should be raised in a motion to dismiss, or be treated as such if raised in a summary judgment motion. <u>Bryant</u>, 530 F.3d at 1374-75 (citation omitted). The Eleventh Circuit has explained the two-step process that the Court must employ when examining the issue of exhaustion of administrative remedies.

> After a prisoner has exhausted the grievance procedures, he may file suit under § 1983. In response to a prisoner suit, defendants may bring a motion to dismiss and raise as a defense the prisoner's failure to exhaust these administrative remedies. <u>See Turner</u>, 541 F.3d at 1081. In <u>Turner v. Burnside</u> we established a two-step process for resolving motions to dismiss prisoner lawsuits for failure to exhaust. 541 F.3d at 1082. First, district courts look to the factual allegations in the motion to dismiss and those

> in the prisoner's response and accept the
> prisoner's view of the facts as true. The
> court should dismiss if the facts as stated by
> the prisoner show a failure to exhaust. Id.
> Second, if dismissal is not warranted on the
> prisoner's view of the facts, the court makes
> specific findings to resolve disputes of fact,
> and should dismiss if, based on those
> findings, defendants have shown a failure to
> exhaust. Id. at 1082-83; see also id. at 1082
> (explaining that defendants bear the burden of
> showing a failure to exhaust).

Whatley v. Warden, Ware State Prison, 802 F.3d 1205, 1209 (11th

Cir. 2015); see Pavao v. Sims, 679 F. App'x 819, 823-24 (11th Cir.

2017) (per curiam).

### 2. Exhaustion under Florida's Prison Grievance Procedure

The FDOC provides an internal grievance procedure for its

inmates. See FLA. ADMIN. CODE r. 33-103.001 through 33-103.018.

Generally, to properly exhaust administrative remedies, a prisoner

must complete a three-step sequential process. First, an inmate

must submit an informal grievance to a designated staff member at

the institutional level. See FLA. ADMIN. CODE r. 33-103.005. If the

issue is not resolved, the inmate must submit a formal grievance at

the institutional level. See FLA. ADMIN. CODE r. 33-103.006. If the

matter is not resolved at the institutional level, the inmate must

file an appeal to the Office of the Secretary of the FDOC. See FLA.

ADMIN. CODE r. 33-103.007.

However, under specified circumstances, an inmate can bypass

the informal-grievance stage and start with a formal grievance at

the institutional level. See FLA. ADMIN. CODE r. 33-103.005(1); 33-

103.006(3). Or, an inmate can completely bypass the institutional level and proceed directly to the Office of the Secretary of the FDOC by filing a "direct grievance." <u>See</u> FLA. ADMIN. CODE r. 33-103.007(3). Emergency grievances and grievances of reprisal[7] are types of "direct grievances" that may be filed with the Office of the Secretary. <u>See</u> FLA. ADMIN. CODE r. 33-103.007(3)(a). In a direct grievance to the Secretary, the inmate "must clearly state the reason for not initially bringing the complaint to the attention of institutional staff and by-passing the informal and formal grievance steps of the institution or facility . . . ." FLA. ADMIN. CODE r. 33-103.007(3)(a)2. If the Secretary determines that the grievance does not qualify as one of the types of direct grievances described in the rule, the grievance must be returned to the inmate, stating the reasons for its return and advising the inmate to resubmit the grievance at the appropriate level. <u>See</u> FLA. ADMIN. CODE r. 33-103.007(3)(d). If the grievance is returned to the institution or facility for further investigation or a response, the inmate may, after receiving the response, re-file with the Secretary if he is not satisfied with the response. <u>See</u> FLA. ADMIN. CODE r. 33-103.007(8).

---

[7] Rule 33-103.002(9) defines a grievance of reprisal as "[a] grievance submitted by an inmate alleging that staff have taken or are threatening to take retaliatory action against the inmate for good faith participation in the inmate grievance procedure." FLA. ADMIN. CODE r. 33-103.002(9).

Florida Administrative Code Rule 33-103.011 provides time frames for submission of grievances. Generally, the following time limits are applicable. Informal grievances must be received within twenty days from the date on which the incident or action that is the subject of the grievance occurred. <u>See</u> FLA. ADMIN. CODE r. 33-103.011(1)(a). Formal grievances must be received no later than fifteen days from the date of the response to the informal grievance. <u>See</u> FLA. ADMIN. CODE r. 33-103.011(1)(b). Similarly, grievance appeals to the Office of the Secretary must be received within fifteen days from the date the response to the formal grievance is returned to the inmate. <u>See</u> FLA. ADMIN. CODE r. 33-103.011(1)(c). Rule 33-103.011(2) provides:

> An extension of the above-stated time periods shall be granted when it is clearly demonstrated by the inmate to the satisfaction of the reviewing authority as defined in paragraphs 33-103.002(15)((b) and (c), F.A.C., or the Secretary that it was not feasible to file the grievance within the relevant time periods and that the inmate made a good faith effort to file in a timely manner. The granting of such an extension shall apply to the filing of an original grievance or when re-filing a grievance after correcting one or more deficiencies cited in rule 33-103.014, F.A.C.

FLA. ADMIN. CODE r. 33-103.011(2). Additionally, Rule 33-103.011(4) states:

> The time limit for responding to grievances and appeals may be extended for a reasonable period agreeable to both parties if the extension is agreed to in writing by the inmate. Unless the grievant has agreed in

> writing to an extension, expiration of a time
> limit at any step in the process shall entitle
> the complainant to proceed to the next step of
> the grievance process. If this occurs, the
> complainant must clearly indicate this fact
> when filing at the next step. If the inmate
> does not agree to an extension of time at the
> central office level of review, he shall be
> entitled to proceed with judicial remedies as
> he would have exhausted his administrative
> remedies. The Bureau of Policy Management and
> Inmate Appeals will nevertheless ensure that
> the grievance is investigated and responded to
> even though an extension has not been agreed
> to by the inmate.

FLA. ADMIN. CODE r. 33-103.011(4).

According to Rule 33-103.014, an informal grievance, formal grievance, direct grievance, or grievance appeal "may be returned to the inmate without further processing if, following a review of the grievance, one or more ... conditions are found to exist." FLA. ADMIN. CODE r. 33-103.014(1). The rule provides an enumerated list as "the only reasons for returning a grievance without a response on the merits." See FLA. ADMIN. CODE r. 33-103.014(1)(a)-(y). Some of the reasons for returning a grievance are as follows: the grievance "addresses more than one issue or complaint" or "is so broad, general or vague in nature that it cannot be clearly investigated, evaluated, and responded to" or "is not written legibly and cannot be clearly understood" or is a supplement to a previously-submitted grievance that has been accepted for review; and the inmate "did not provide a valid reason for by-passing the previous levels of review as required or the reason provided is not

acceptable," or "used more than two (2) additional narrative pages." See FLA. ADMIN. CODE r. 33-103.014(1)(a), (b), (c), (f), (q), (t).

### 3. McNeely's Exhaustion Efforts

As a threshold matter,[8] Defendants maintain that McNeely failed to exhaust his administrative remedies, as required by the PLRA, before filing this 42 U.S.C. § 1983 lawsuit. See Motion at 13-15. In support of their position, Defendants submitted the Declaration of Ashley Stokes (Def. Ex. B; Stokes Decl.). As the custodian of FDOC grievance records at the Secretary's Office, Stokes states, in pertinent part:

> In February 2018, Senior Assistant Attorney General Marcus O. Graper contacted me regarding inmate Stephen McNeeley's allegation of an inability to file grievances due to alleged threats. In this case, inmate Stephen McNeeley (FDC #956866) alleges that he was threatened not to file grievances associated with a use of force that occurred on March 30, 2012, which prevented him from exhausting his administrative remedies prior to filing a lawsuit on March 25, 2016. Contrary to inmate McNeeley's assertion, the grievance procedure was available to him with procedures for this situation.
>
> Generally, the FDC has three steps in their grievance procedure, which is under Chapter 33-103, Florida Administrative Code, that start with an informal grievance where, if the inmate is unsatisfied with the response

---

[8] Although Defendants raised their failure-to-exhaust defense in a motion for summary judgment, the Court must treat the issue as if it had been raised in a motion to dismiss. See Bryant, 530 F.3d at 1374-75.

received [he] may file a formal grievance, and then can pursue further relief by submitting an appeal to the Secretary's office. A formal grievance, grievance appeal, and direct grievance are filed on a DC1-303 form. Rule 33-103.006(1), 33-103.007(1), Fla. Admin. Code.

A type of grievance (Direct Grievance) that can bypass the informal grievance or formal grievance level is a "Grievance of Reprisal." Rule 33-103.006(3), 33-103.007(6), Fla. Admin. Code. A Grievance of Reprisal is "A grievance submitted by an inmate alleging that staff have taken or are threatening to take retaliatory action against the inmate for good faith participation in the inmate grievance procedure." Rule 33-103.002(9), Fla. Admin. Code.

While an inmate may have a grievance logged at the prison, if the inmate desires to discretely file the grievance, the inmate may file the grievance directly to the Office of the Secretary of the FDC by placing it in a sealed envelope, which is processed postage free through routine institutional channels. Rule 33-103.006(8), 33-103.007(6)(a)3., Fla. Admin. Code. For the grievance to be considered as a properly filed Direct Grievance, the "inmate must clearly state the reason for not initially bringing the complaint to the attention of institutional staff and by-passing the informal and formal grievance steps of the institution or facility." Rule 33-103.007(6)(a)2., Fla. Admin. Code. While an inmate has notice of this 'sealed envelope' method from the grievance rules, the inmate is also provided notice of this method on each blank DC1-303 form at the bottom of the form.

Generally, a grievance must be filed within a specific amount of time from the date of the incident or action being grieved. Rule 33-103.011, Fla. Admin. Code. A Direct Grievance must be filed within 15 days of the date on which the incident or action being

> grieved occurred. Rule 33-103.011(1)(d), Fla.
> Admin. Code. If an inmate feels that he was
> unable to file a grievance within the
> specified time periods [at] his current
> custodial institution or facility, the inmate
> can also file an out-of-time grievance. Rule
> 33-103.011(2), Fla. Admin. Code. In this
> circumstance, the inmate must clearly
> demonstrate in the grievance that "it was not
> feasible to file the grievance within the
> relevant time periods and that the inmate made
> a good faith effort to file in a timely
> manner." <u>Id.</u>

Stokes Decl. at 1-2 (enumeration omitted).

Defendants assert that McNeely did not file any grievances addressing the March 30, 2012 incident. <u>See</u> Motion at 13-15. They concede that a similarly-situated inmate facing retaliation, as alleged by McNeely, would be deterred from filing informal and formal grievances at UCI. <u>See id.</u> at 14. Nevertheless, according to Defendants, the grievance procedures were still available to McNeely because he could have bypassed the institutional level, UCI, by filing a grievance of reprisal directly with the FDOC Secretary's Office in a sealed envelope. <u>See id.</u>; Stokes Decl. at 2. They also state that McNeely could have filed an out-of-time grievance after he was transferred from UCI to other penal institutions. <u>See id.</u>; Def. Ex. C, Inmate Movement Transfer History (showing the FDOC transferred McNeely to ten different prisons from October 19, 2012, until March 25, 2016, when he initiated the lawsuit).

As to the initial step in the two-part process for deciding motions to dismiss for failure to exhaust under the PLRA, the Eleventh Circuit has instructed:

> District courts first should compare the factual allegations in the motion to dismiss and those in the prisoner's response and, where there is a conflict, accept the prisoner's view of the facts as true. "The court should dismiss if the facts as stated by the prisoner show a failure to exhaust." Id.[9]

Pavao, 679 F. App'x at 823-24. Here, accepting McNeely's view of the facts as true, a dismissal is warranted. McNeeley maintains that "it is undisputed that [he] did not lodge[] any grievances/appeals regarding the subject incident." Response at 18. In the SAC, McNeely explains:

> Because of Godwin's and Reddish's threats, and advice not to grieve the use of force, I was unable to exhaust my administrative remedies. I took the threats seriously. The threats froze my right to file the grievances.

SAC at 10, ¶ 13.

McNeely asserts that the Court should relieve him of the exhaustion requirement because the FDOC's administrative remedies were unavailable to him. See Response at 11-12, 16-23. According to McNeely, Defendant Godwin threatened him with additional, more harmful abuse if he filed any grievances about the March 30th incident, and Reddish also advised against utilizing the grievance procedures. See id. at 19. He states that Godwin and Reddish would

---

[9] Whatley, 802 F.3d at 1209.

have known if he had filed any grievances at UCI because Reddish was UCI's head administrator, and Godwin was the top administrator of UCI security. See id. at 18-19. He maintains that he "was deterred from filing grievances about the excessive force from any institution" within the FDOC. Id. at 21. According to McNeely, Defendants' arguments fail because (1) Godwin and Reddish's threats "froze" his ability to exhaust, see id. at 18; (2) he was in special housing, and therefore was required to give a grievance (sealed or unsealed) to a UCI officer, see id. at 19; (3) Godwin told McNeely that he would know if McNeely ever filed a grievance at another prison and would "reach out and touch him like AT&T," id.; (4) McNeely had witnessed abuse against other inmates, and had been subjected to abuse over the past fifteen years in close management, and therefore feared staff abuse, see id.; (5) a Santa Rosa colonel told McNeely that he "had better not start all that snitching at Santa Rosa," id. at 20; (6) McNeely complained to Florida Department of Law Enforcement Special Agent Brown about the UCI abuse, see id.; (7) Reddish was aware of the March 30, 2012 use of force because he reviewed and approved the disciplinary reports issued against McNeely, see id.; and (8) McNeely later saw Godwin at Columbia Correctional Institution Annex, and Godwin said, "I told you I would see you again," id.

In support of his position, McNeely filed a declaration, stating in pertinent part:

Several days after the incident defendant Godwin came to the dorm and saw me. He stated that my eyes looked nice. I asked him if he had seen the use of force video. He stated that there was no video. That if I file any grievances regarding the use of force I will get my teeth knocked out of my mouth. He advised me that there was a new chief in town. He told me that even if I leave/transfer that he would still be able to reach out and touch me like AT&T. That he would see me again. In fact I did get transferred and did see him again 2 years later. I've transferred to a prison where he's been at twice since the incident. When I seen [sic] him 2 years after the incident, he stated, "I told you I would see you again."

Days after I saw Reddish and I told him what Godwin said and he advised me not to file any grievances with a smile on his face.

In the past I have been slapped around at one prison for an officer at another prison.

Days after the incident I was transferred to Santa Rosa CI where the Colonel came to my cell and told me that I had better not start all that snitching at Santa Rosa if I know what's good for me and my well being.

I was interviewed twice by Special Agent Brown of the F.D.L.E. regarding the abuse at Union CI, and an inmate who I witnessed get his teeth knocked out of his mouth.

I also complained to him about the threats to my well being and he told me he would say something to the institutional inspector.

Nothing was ever done because I never saw an inspector and the colonel continued to remind me of what he told me when I first got there.

I was never housed (or been at) at a private prison (South Bay).

Since September 2012[,] plaintiff has been transferred to a prison where the defendants have been 4 sep[a]rate times.

I never filed any Disciplinary Appeals due to the threats.

The video grievance of staff abuse that I made initiated an investigation and took the same course as would have a grievance on a grievance form.

I am an inmate of ordinary firmness and fortitude as I have courageously taken a stand against the abusive good old boy prison officials in the face of significant injury and retaliation.

The serious threats of substantial retaliation, by Godwin against me was in conjunction with the significant injury inflicted upon me and the knowledge of the abuse happening to others before and after the March 30 incident with impunity. I took the serious threats of abuse if I file a grievance seriously. The threats shocked my consciousness on a level that deterred me from filing/lodging a grievance or appeal not just at the prison I was at when the threats happened but at any prison I went to.

I am still being threatened by the defendants. Not for filing a grievance but for filing the lawsuit. I was told by defendant Harris that "he would get me" that "I got you" . . . . . I immediately declared a psychological emergency and had it documented in my file. And I filed a grievance of reprisal against him but it never showed up in the grievance office. (see Ex. 32 pg. 1)[10] I have filed numerous grievances regarding the abuse I've witnessed and the failure to answer my grievances to no avail.

---

[10] See P. Ex. 32, Inmate Request, dated November 1, 2018 (inquiring about his grievance of reprisal, dated October 29, 2018).

> I feel I can file grievances against the
> defendants now because I have the court
> looking over my shoulder . . . I hope!

P. Ex. 1, Declaration of Stephen B. McNeely at 7-10 (enumeration omitted). He also submitted the declarations of other inmates. <u>See</u> P. Exs. 25-30; 28, Declaration of Kristopher Sanders (stating he overheard Godwin tell McNeely that he would lose some teeth if he filed any grievances or appeals about the March 30, 2012 incident).

The parties agree that McNeely failed to submit any grievances related to the March 30, 2012 incident. Nevertheless, taking McNeely's account of the facts as true, as the Court must, the Court determines that the FDOC grievance procedures were available to McNeely. <u>See</u> Stokes Decl. The FDOC rules provided that McNeely, while housed at UCI, could have bypassed the institutional level, and submitted a grievance of reprisal directly with the FDOC Secretary's Office in a sealed envelope, <u>see</u> FLA. ADMIN. CODE r. 33-103.002(9), (15)(d)2.; 33-103.007(3)(a), (5)(e), or filed an out-of-time grievance when he resided at different institutions, <u>see</u> FLA. ADMIN. CODE r. 33-103.011(2); Def. Ex. C, Inmate Movement Transfer History. McNeely neither filed a grievance of reprisal nor an out-of-time grievance when those grievance options were available to him even in the midst of Godwin and Reddish's alleged threats. Therefore, given the availability of administrative remedies, McNeely was required to exhaust the issues.

Alternatively, McNeely maintains that he satisfied the exhaustion requirement when he orally complained about the March 30th incident. <u>See</u> Response at 22. He states, in pertinent part:

> Plaintiff argues that the grievance he made on video[11] that triggered an official investigation for excessive force was exhaustion of administrative remedies. (Ex. 1)
>
> Further, plaintiff argues that when an inmate makes a complaint of staff abuse (excessive force) whether it is made on a "form" or on "video" [sic] takes the same shape and is processed the same, investigated the same and reviewed for approval or disapproved the same. (Pla. Ex. 31).
>
> Furthermore, plaintiff argues that his "video grievance" satisfies title 42 U.S.C. section 1997e(a).... The general rule under the Prison Litigation Reform Act is that the grievance need only provide administrators with a fair opportunity under the circumstances to address the problem that will later form the basis of the suit. (Ex. 31)
>
> Moreover, whenever an inmate lodges a grievance on form DC6-236 or DC1-303 regarding excessive force whether it is filed as an informal grievance, formal grievance, direct grievance, grievance of reprisal or an emergency grievance, and whether it is filed with the institution or with the secretary's office the response will be the same ... (that the incident has been referred to the inspector general's office).... (Pla. Ex. 31)

<u>Id.</u> at 22-23. McNeely's assertion that his videotaped complaint satisfies the exhaustion requirement is unavailing. As previously stated, the FDOC provided an internal grievance procedure for its

---

[11] <u>See</u> Def. Ex. M-1 (sealed exhibit) at 33:45-33:56, 35:35-35:51 (7:24 p.m.).

inmates, <u>see</u> FLA. ADMIN. CODE r. 33-103.001 through 33-103.018, that provides specific sequential steps for proper exhaustion. The FDOC rules do not and did not include any provisions for video grievances. Based on the foregoing, Defendants' Motion as to Plaintiff's claims against them for failure to exhaust is due to be granted.[12]

Therefore, it is now

**ORDERED**:

1.    Defendants' Motion (Doc. 82) is **GRANTED** as to McNeely's claims against them for his failure to exhaust, and the case is **DISMISSED**. Otherwise, the Motion is **DENIED**.

2.    The Clerk shall terminate any pending motions and close the case.

**DONE AND ORDERED** at Jacksonville, Florida, this 5th day of February, 2019.

<u>MARCIA MORALES HOWARD</u>
United States District Judge

---

[12] Notably, exhaustion of available administrative remedies is "a precondition to an adjudication on the merits" and is mandatory under the PLRA. <u>Bryant</u>, 530 F.3d at 1374. Therefore, the Court will not address Defendants' other arguments since McNeely's claims against them are due to be dismissed for McNeely's failure to exhaust.

sc 2/5
c:
Stephen Brent McNeely, FDOC #956866
Counsel of Record